## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLASP,<br><br>                    Plaintiff,<br><br>          v.<br><br>ASIF HASSAN,<br><br>                    Defendant. | Civil Action No. 25-1197 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The claims in this case stem from the cross-slinging of accusations by an employer that a terminated employee downloaded and took with him proprietary electronic files belonging to the employer, and by the employee that his termination and treatment, both before and after being fired, are due to racial and religious discrimination. Specifically, plaintiff CLASP, a "nonprofit organization" with a mission to "improve the energy and environmental performance of appliances and equipment," Compl. ¶ 2, ECF No. 1, alleges that immediately prior to being fired, defendant Asif Hassan downloaded "over 26,000" files, some containing CLASP's "confidential and propriety information," transferred "at least 1,330" of those files onto his personal hard drive, and then deleted all of the downloaded files from CLASP's server. Compl. ¶¶ 1, 5, 6, 11, 53, 54, 57-65, 67, 68. According to CLASP, these alleged actions by Hassan breached an employment confidentiality agreement and violated federal and D.C. trade secrets laws. Compl. ¶¶ 88-99 (Count I, federal Defend Trade Secrets Act, 18 U.S.C. § 1836); *id.* ¶¶ 100-109 (Count II, D.C. Uniform Trade Secrets Act, D.C. Code §§ 36-401 to 36-409); *id.* ¶¶ 110-120 (Count III, Breach of Contract). For his part, Hassan disputes these claims, contesting both the factual allegations as to his conduct and the scope and meaning of the broadly-worded confidentiality agreement, and

1

further asserts a counterclaim alleging that he was subjected to CLASP's discriminatory actions during his employment, by his termination and thereafter, based on his race and religion, in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*.  *See* Answer to Compl. ("Answer") ¶¶ 1, 5, 6, 11, 53, 54, 57-65, 67, 68; Countercl. ¶¶ 37-50, ECF No. 7 at 10; Am. Countercl. ¶¶ 67-79, ECF No. 16.

Pending before the Court are CLASP's motions to dismiss Hassan's counterclaim for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), Pl.'s Mot. to Dismiss Am. Countercl. Pursuant to Rule 12(b)(6) ("Pl.'s 2d MTD"), ECF No. 18; Pl.'s Mem. P. & A. in Supp. of Mot. to Dismiss Am. Countercl. Pursuant to Rule 12(b)(6) ("Pl.'s MTD Mem."), ECF No. 18-1, and for partial judgment on Count III (breach of contract), pursuant to Federal Rule of Civil Procedure 12(c), Pl.'s Mot. Part. J. on Pleadings ("Pl.'s Part. J. Mot.") at 1, ECF No. 9; Pl.'s Mem. in Supp. of Mot. Part. J. on Pleadings ("Pl.'s Part. J. Mem."), ECF No. 9-1.  As relief, if granted partial judgment for breach of contract, CLASP seeks an injunction directing Hassan (a) to "present his devices to a third-party vendor" and provide all of his "email accounts[] and cloud storage accounts," along with "all credentials needed to access the devices or accounts," in order for the vendor to "remove all of CLASP's Confidential Information and property" and "create a forensic image of all devices and accounts" on which the vendor could then "perform a forensic analysis"; (b) to delete any other copies Hassan has of CLASP's material, and (c) to attest that he "no longer retains any of CLASP's documents or data."  Pl.'s Part. J. Mem. at 12; Jt. Status Report (Oct. 16, 2025) ("JSR") at 5-6, ECF No. 23 (elaborating on terms of plaintiff's requested injunction).[1]  Although no specific damages allegations in either its Complaint or its Motion for

---

[1]    In response to the Court's queries about the seemingly "scorched earth" scope of the forensic searches contemplated by CLASP of its former employee's electronic data held on devices or in online accounts, CLASP confirmed its demand for Hassan to "bring all of his devices to the vendor, and provide the vendor with access to all relevant accounts including all credentials needed to access the devices or accounts. . . . The vendor will create a

Partial Judgment on the Pleadings are asserted, CLASP nonetheless, somewhat vaguely, "reserves the right to seek additional penalties and damages associated with Defendant's breach," "[s]hould CLASP be granted judgment," Pl.'s Part. J. Mem. at 12 n.6, raising the explicit specter that grant of this motion may open a proverbial Pandora's Box of potential "wish list" remedial requests by CLASP, all prior to the completion of discovery or scrutiny of the legal viability, scope and meaning of the confidentiality agreement that was allegedly breached, and based primarily on CLASP's "forensic analysis report prepared by Dataprise" ("Forensic Report"), Pl.'s Part. J. Mot., Ex. 1, Decl. of Guy G. Brenner, CLASP Counsel ("Brenner Decl."), ECF No. 9-2, which analysis and report, at this point, Hassan has had little to no opportunity to contest.

For the reasons discussed below, both of CLASP's motions are denied.

## I.    BACKGROUND

Summarized below in chronological order are the factual allegations drawn from the Complaint, Answer and Amended Counterclaim, with any factual disputes and plausible inferences resolved in Hassan's favor, given that CLASP is the movant on both pre-discovery motions. *See infra* Section II.A, B. The procedural history then follows.

### A.  Factual Background

CLASP is a "nonprofit organization that works globally to improve the energy and environmental performance of appliances and equipment." Compl. ¶ 1; Answer ¶ 1. Hassan was employed at CLASP for almost ten years, from August 2016 until his termination on March 14, 2025, following a performance improvement plan ("PIP") instituted in November 2024. Compl. ¶¶ 4, 49; Answer ¶¶ 4, 49; Am. Countercl. ¶ 5. From January 2019, until his termination, Hassan's job title was "Senior Associate," Compl. ¶ 18; Answer ¶ 18, and his responsibilities included

---

forensic image of all devices and accounts . . . ." JSR at 5; *see* Minute Order (Oct. 9, 2025) (requesting parties' responses to queries).

"program management, business development, proposal writing, and field research," along with "data development and analysis," Answer ¶ 4; *see* Compl. ¶ 4 (stating that Hassan "worked primarily to develop data and analysis to support clean energy access programs in Bangladesh and Asia").

### 1. Alleged Employment Discrimination

Hassan alleges that, throughout his employment with CLASP, by terminating him, and in his treatment thereafter, CLASP discriminated against him based on his race (Bangladeshi South Asian) and religion (Muslim), *see* Am. Countercl. ¶¶ 6, 67-79, recounting the following instances of alleged discrimination.

#### a. Religious Accommodations During Employment

Hassan was the only practicing Muslim at CLASP's U.S. office, Am. Countercl. ¶ 6. According to Hassan, CLASP failed to accommodate his religious dietary needs by neglecting to provide halal food at organization events after Hassan requested such food. *Id.* ¶ 63. Hassan also "felt pressured by CLASP" to "travel during Ramadan . . . while fasting," even though he explained to Amanda Upshaw, CLASP's Chief of Staff, that it "would be difficult" for him to do so. *Id.* ¶ 64. Hassan also alleged that he was "never provided any time off to celebrate Eid Ul Fitr and Eid Ul Adha," the "biggest religious festivals for Muslims." *Id.* ¶ 65.[2]

#### b. Differential Treatment During Employment

Hassan describes several instances of perceived mistreatment that he attributes to religious or racial discrimination against him as the only Muslim at CLASP's U.S. office and the only South Asian person at that office "[u]ntil recently." Am. Countercl. ¶ 6. On the date that Hassan's

---

[2]      CLASP disputes that Hassan requested time off for these holidays and claims CLASP has an unlimited leave policy, Pl.'s MTD Mem. at 10, but this dispute is irrelevant in evaluating CLASP's motion to dismiss the counterclaim for failure to state a claim, *see infra* Section II.B.

grandmother died in December 2023, Hassan's supervisor, Collin Taylor, nonetheless "strongly suggested" that Hassan join a meeting later that "same day." *Id.* ¶ 11. In June 2024, Taylor asked Hassan to join a meeting and complete a report while Hassan was on vacation. *Id.* ¶ 21. In October 2024, Hassan was excluded from an international conference that several of his "White, American born . . . , non-Muslim" colleagues were permitted to attend. *Id.* ¶ 18-19. Finally, according to Hassan, neither CLASP nor Hassan's colleagues acknowledged Hassan's work-related accomplishments, which was "different than the treatment [his] colleagues received after accomplishing significant achievements." *Id.* ¶ 24; *see also id.* ¶ 8. Without specifically tying each of these incidents to Hassan's race or religion, the amended counterclaim alleges generally that he "was treated differently than his similarly situated colleagues who reported to Mr. Taylor," including in the ways described above and via "a consistent stream of negative feedback and criticism for minor non-work-related matters." *Id.* ¶ 72.

### c. *Events Leading to Termination*

Hassan received positive feedback in performance reviews through at least June 2024, *id.* ¶ 20, and in early November 2024 was told that his performance "[m]et [e]xpectations," *id.* ¶ 30. "Throughout 2024," Taylor told Hassan that his "job was completely secure based on Mr. Hassan's work performance and the milestones that had been achieved." *Id.* ¶ 26. Hassan additionally attests to his achievements and contributions at CLASP, including protecting the organization's interests, *id.* ¶ 8, leading important projects, *id.* ¶ 10, and securing deals with partners, *id.* ¶ 14; *see also id.* ¶¶ 15-17, 22-23, 28.

Despite assurances about his performance up to early November 2024, Taylor submitted a performance review around November 15, 2024, that described Hassan as "unreliable or dodgy," due to his failure to complete a required report, which review Hassan characterizes as "misleading

and inaccurate." *Id.* ¶ 29. A few days later, Taylor told Hassan that he could either be placed on a PIP or resign, *id.* ¶ 31, and further advised that Hassan's performance review information had been shared with the CLASP Chief Executive Officer ("CEO"), Christine Egan, and Human Resources ("HR") department, though such disclosure, according to Hassan, "goes against the performance review practice set up by CLASP," *id.* ¶ 32. From Hassan's perspective, although "[t]he PIP was presented . . . as an opportunity to enhance his performance with the plan that his role with CLASP would be secured . . . [,] [the PIP] appeared to be nothing but a pre-planned set up to make Mr. Hassan work extremely hard, achieve complex programmatic goals through his hard work, and then terminate Mr. Hassan once the milestones were achieved." *Id.* ¶ 37.

As support for this view of the PIP, Hassan alleges that CLASP attempted in various ways to undermine his ability to succeed while being subject to the PIP. First, CLASP's HR Department "organize[d] a PIP kick-off call on a day when over 15 [colleagues from other offices] were present in the office," resulting in those colleagues "observing Mr. Hassan's meeting through transparent dividers or windows and asking questions afterwards." *Id.* ¶ 36. Second, on November 26, 2024, Hassan's wife suffered a miscarriage, and CLASP nonetheless required Hassan to attend a mandatory in-person training every day that week, despite his having informed CLASP of his family's situation, forcing Hassan to "leav[e] his sick wife at home while she was dealing with physical and mental trauma." *Id.* ¶ 38. Third, while Hassan was on the PIP, the director of the Climate team of which Hassan was a member, Ana Maria Carreno, "got upset" because Hassan was taking "too much time sharing" in "weekly climate team calls[] where everyone typically shared their achievements and updates," when "other colleagues could take more time to share." *Id.* ¶ 39. Negative feedback about Hassan's sharing was reflected in the feedback he received as part of his PIP. *Id.* Fourth, Taylor "asked Mr. Hassan to work through the Christmas holidays,"

even though "most CLASP employees took time off from mid-December to January 4th," and Hassan felt he "could not say 'No' . . . [because] he was [] under a PIP already." *Id.* ¶ 44. When Hassan sought time off to recuperate after working through the holiday, the request was denied, and Hassan "fell sick right away." *Id.* ¶ 43. Hassan characterizes these events as "deliberate choice[s] aimed at exerting mental pressure on him." *Id.* ¶ 36.

### d. *Termination, Severance, and Enforcement of Confidentiality Agreement*

Two weeks before Hassan's PIP was set to end, CLASP terminated his employment on March 14, 2025, during Ramadan, around the time of weekly Friday prayer that Hassan would normally attend at a mosque. Am. Countercl. ¶ 48.[3] As reasons for the termination, CLASP told Hassan that the organization was "not willing to continue working in Bangladesh" and thus there was a "[l]ack of work/projects that matched Mr. Hassan's skillset." *Id*. ¶ 51. Hassan alleges that, during his employment at CLASP, he had worked in many other countries and on non-country-specific projects, and that his "work agreement with CLASP never termed him as a Bangladesh focused employee." *Id.* ¶ 52. Indeed, CLASP itself describes Hassan's work as supporting clean energy access programs not only in Bangladesh but also more broadly in "Asia." Compl. ¶ 4. Additionally, Hassan notes that "CLASP's decision to stop working in Bangladesh . . . impacted the only Bangladeshi employee." Am. Countercl. ¶ 73.

After Hassan's termination, CLASP and Hassan engaged in severance negotiations, resulting in a final severance offer of two-and-a-half months' severance, compared to "the standard 4+ months [Hassan] was eligible for" and "had been provided to other employees who had recently

---

[3]    CLASP asserts that Hassan fails to allege that he told CLASP of this conflict on that date, Pl.'s MTD Mem. at 11, but Hassan alleges, repeatedly, that this service was "weekly," Am. Countercl. ¶ 48, and implies his attendance was regular, thereby presenting a factual dispute about whether CLASP was or should have been aware of the conflict with his religious practice, though this dispute is irrelevant in evaluating CLASP's motion to dismiss the amended counterclaim for failure to state a claim, *see infra* Section II.B.

been terminated," namely, Ana Luisa Sosa and Wendy Hado. *Id.* ¶¶ 54-55. As support showing these two former CLASP employees are appropriate comparators, Hassan alleges that Sosa, a "Hispanic, Venezuelan born . . . , non-Muslim," held the same job title as Hassan, worked at CLASP for "a similar number of years," and was terminated around the same time, *id.* ¶ 55; Def.'s MTD Opp'n at 20, but received a "more favorable and different severance package" than Hassan, Am. Countercl. ¶ 55. Hado, an "African American, American born . . . , non-Muslim," was a manager on the Clean Energy Access Team, and also received a "more favorable and different severance package" than Hassan. *Id.*

Finally, Hassan alleges that "CLASP selectively enforces data removal policies," such as the policies reflected in the Confidentiality Agreement on which CLASP's breach of contract claim is based. *Id.* ¶ 59. According to Hassan, for example, CLASP allowed "external consultants" to use their personal laptops for CLASP-related work and did not engage those consultants in "post-contract data removal protocols," as CLASP has attempted to do after Hassan's termination. *Id.* In his view, this policy is being enforced "only against him, a Bangladeshi national." *Id.* ¶ 59.

### 2. Alleged Breach of Contract

On January 15, 2019, after Hassan had been a CLASP employee for nearly three years, Hassan signed a "Confidentiality, Prior Inventions, Non-solicitation, and Non-disparagement Agreement" ("Confidentiality Agreement"), presented by CLASP. Compl. ¶ 30-31; *id.*, Ex. 1, Confidentiality Agreement at 1, ECF No. 1-1; Answer ¶ 30. In relevant part, the Confidentiality Agreement states that:

> **You [the employee] will return Confidential Information and CLASP property to CLASP.** If your employment with CLASP ends (or earlier if requested by CLASP), you agree to return to CLASP all copies of any materials (including documents and data) you have that contain Confidential Information or otherwise belong to CLASP and to destroy any electronic copies of such materials, whether they are on your computers, personal electronic devices, cellphones, cloud storage

accounts, or other accounts or devices.  You also agree to return any property belonging to CLASP that you have in your possession at the time your employment ends.  You may keep your compensation records and a copy of this Agreement. Prior to leaving, you agree to cooperate with CLASP in completing and signing CLASP's departure statement if requested to do so by CLASP.

Confidentiality Agreement at 3 (emphasis in original).  The Confidentiality Agreement broadly describes "CLASP property" to extend, apparently, far beyond physical items provided to employees and to be "ideas, products, services, processes, and designs you have or will develop or contribute to and that relate to CLASP's work."  *Id.* at 1-2.  This agreement further defines "Confidential Information" to be "information and physical materials not generally known or available outside of CLASP."  *Id.* at 2.  In addition to requiring the return of such "Confidential Information" and "CLASP property," the Confidentiality Agreement prohibits Hassan from "us[ing] or disclos[ing] any Confidential Information, except as required to do [his] job," even "if [he] leave[s] CLASP."  *Id.* at 3.

On March 13, 2025, approximately two weeks before Hassan's PIP was set to expire, CLASP's HR director, Naté Harris, sent Hassan a calendar invitation to a meeting at 2:00 PM the following day, March 14.  Compl. ¶ 51; Answer ¶ 51.  CLASP planned to terminate Hassan's employment in the meeting.  Compl. ¶ 51.  CLASP alleges that on March 13, after Hassan's receipt of the calendar invite, he "download[ed] numerous zipped folders containing over 26,000 files of CLASP's data from CLASP's cloud storage site on Box.com to his CLASP-issued laptop."  Compl. ¶ 53.[4]  The next day, March 14, prior to the scheduled meeting at which he was terminated, Hassan allegedly "transferred at least 1,330 of the files he downloaded . . . to [his personal] external hard drive."  Compl. ¶ 54.

_____

[4]     As evidence to supports its allegations, CLASP submitted with its Motion for Partial Judgment on the Pleadings a lengthy forensic report commissioned by CLASP from a third-party company, Dataprise, *see* Brenner Decl., Ex. A, Forensic Report, ECF No. 9-3, and argues this report may be considered as incorporated into its Complaint, *see* Pl.'s Part. J. Reply at 5 n.6, ECF No. 7.  For the reasons discussed *infra* Section III.A.1, the report will not be considered in resolving the pending motions.

In response to these and other allegations, Hassan states that he "lacks sufficient information at this time to admit or deny the allegation[s] as set forth in paragraph[s]" 53 and 54, "and therefore denies." Answer ¶¶ 53-54; *see* FED. R. CIV. P. 8(b)(5) ("A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial."). He also flatly "denies that he was aware he would be informed of his termination" at the March 14 meeting. Answer ¶ 51.[5] CLASP concedes that a portion of the files Hassan downloaded and transferred to his hard drive were, in fact, Hassan's personal files, *see* Compl. ¶ 70 ("The files Defendant downloaded and transferred to the Drive also included a number of personal files and photos."), and, presumably, such personal files are not subject to the Confidentiality Agreement at all. CLASP further alleges that Hassan "deleted the folder in CLASP's cloud storage site in which the[] [26,000+] files were kept," Compl. ¶ 8, which Hassan also flatly denies, Answer ¶ 8.

After Hassan allegedly completed the transfer of documents to his personal hard drive, he was terminated at the meeting on 2:00 PM on March 14, 2025. Compl. ¶ 55; Answer ¶ 55.

A couple of weeks later, CLASP's counsel contacted Hassan on April 3, 2025, and over the next two weeks, communicated to Hassan CLASP's view that Hassan had violated CLASP's Confidentiality Agreement and, on CLASP's behalf, requested the return of CLASP documents.

---

[5]    In his briefing, Hassan states that he "has consistently admitted that he may have transferred some CLASP work files while he was trying to transfer his personal materials to [his] external hard drive," and further advises that, by his own accounting, of the files transferred to his personal hard drive, 736 were his personal documents, such as immigration, medical, and tax documents; 100 were publicly available, such as reports previously published by CLASP; 321 were "non-programmatic documents" such as "meeting invites, meeting notes, [and] external webinar invites," and 92 were "work related email communications which are openly available to several other employees who were copied in those emails." Def.'s Part. J. Opp'n at 12-17. Hassan acknowledges in his briefing that the remaining 90 files "may include CLASP programmatic files." *Id.* at 17. Without details about the so-called "CLASP programmatic files" and in the face of the denials in the Answer, whether these files qualify as "CLASP property" or CLASP's "Confidential Information," subject to the express terms of the Confidentiality Agreement, presents a factual issue, along with the follow-on question as to the legal viability of the terms of that Agreement, and both that factual issue and legal question are premature to resolve, pre-discovery, in connection with the pending motions.

Compl. ¶¶ 72-73, 76-77, 82-83, 85; *id.*, Ex. 4, Apr. 3 Letter from Guy Brenner, CLASP Counsel, to Hassan ("Pl.'s Apr. 3 Letter") at 1-2, ECF No. 1-4; *id.*, Ex. 6, Apr. 4 Letter from CLASP Counsel to Hassan ("Pl.'s Apr. 4 Letter") at 1-2, ECF No. 1-6; *id.*, Ex. 8, Apr. 9 Letter from CLASP Counsel to Hassan ("Pl.'s Apr. 9 Letter") at 1, ECF No. 1-8; *id.*, Ex. 10, Apr. 16 Letter from CLASP Counsel to Hassan ("Pl.'s Apr. 16 Letter") at 1, ECF No. 1-10; Answer ¶¶ 72-73, 76-77, 82-83, 85. To effectuate the return, CLASP suggested that Hassan bring his hard drive to a third-party vendor that would transfer to a new hard drive and delete from the original hard drive, Hassan's personal files, and give the new hard drive to Hassan, allowing CLASP to keep Hassan's original hard drive containing CLASP files, Pl.'s Apr. 4 Letter at 2, and his deleted personal files, which may be subject to forensic recovery.

For his part, Hassan expressed that he had intended to download only personal files along with "work materials that [he] developed for the organization," Compl. ¶ 74 (alteration in original); *id.*, Ex. 5, Apr. 3 Letter from Hassan to CLASP Counsel ("Def.'s Apr. 3 Letter") at 2, ECF No. 1-5; Answer ¶ 74, and that he would be willing to delete CLASP's files from the hard drive, Def.'s Apr. 3 Letter at 2; Compl. ¶ 75; Answer ¶ 75. He also assured CLASP's counsel that he had not shared CLASP property with anyone else or used that property "in any way for [his] personal benefit." Compl. ¶ 79; *id.*, Ex. 7, Apr. 7 Letter from Hassan to CLASP Counsel ("Def.'s Apr. 7 Letter") at 1, ECF No. 1-7; Answer ¶ 79; *see also* Compl., Ex. 11, Apr. 17 Letter from Hassan to CLASP Counsel ("Def.'s Apr. 17 Letter") at 1, ECF No. 1-11. Hassan declined CLASP's offer for a third-party vendor to transfer Hassan's personal documents onto a new hard drive and retain Hassan's hard drive, expressing concerns about maintaining the privacy of his personal documents stored on that hard drive. *See* Def.'s Apr. 7 Letter; Compl., Ex. 9, Apr. 11 Letter from Hassan to CLASP Counsel ("Def.'s Apr. 11 Letter") at 1, ECF No. 1-9. On April 17, Hassan told CLASP

that he had consulted with, but not yet retained, an attorney to assist him in negotiations with CLASP, and that he was accordingly not yet ready to accept CLASP's suggestions for resolving the dispute.  Compl. ¶ 86; Def.'s Apr. 17 Letter; Answer ¶ 86.

### B.  Procedural Background

The very next day, April 18, 2025, despite Hassan alerting CLASP about his planned retention of counsel to assist in negotiations with CLASP's counsel to resolve the dispute, CLASP filed this federal lawsuit, alleging violations of federal and D.C. trade secrets laws and breach of contract.  *See* Compl.  Hassan timely answered, Answer at 1-10, and filed his original counterclaim, followed by an amended counterclaim, pursuant to the DCHRA, D.C. Code § 1401 *et seq.*, alleging that CLASP discriminated against him based on his race and religion, Am. Countercl. at 10-20.[6]

CLASP's motions for partial judgment on the pleadings seeking—at least for now—an injunction as to its breach of contract claim, and to dismiss Hassan's amended employment discrimination counterclaim are ripe for resolution.

## II.    LEGAL STANDARD

### A.  Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial."  FED. R. CIV. P. 12(c).  In considering a motion for judgment on the pleadings, "matters outside the pleadings" may not be considered, unless the motion is converted into "one for summary judgment," FED. R. CIV. P. 12(d); *see Wiley v. Glassman*, 511 F.3d 151, 160 n.1 (D.C.

---

[6]    CLASP's first Motion to Dismiss Hassan's original counterclaim, Pl.'s [1st] Mot. to Dismiss, ECF No. 11, is denied as moot, due to the filing of the Amended Counterclaim.  *Accord Barnes v. District of Columbia*, 42 F. Supp. 3d 111, 116-17 (D.D.C. 2014) (motion to dismiss original complaint mooted by filing of amended complaint as of right).

Cir. 2007), and "the Court should accept as true the allegations in the opponent's pleadings and accord the benefit of all reasonable inferences to the non-moving party," *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (internal quotation marks and citation omitted). This means, in plainer terms, that "[t]he moving party must demonstrate its entitlement to judgment in its favor, even though the 'court evaluating the 12(c) motion will accept as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant.'" *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 933 F.3d 751, 760-61 (D.C. Cir. 2019) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006)); *see also Beal v. Missouri Pac. R.R. Corp.*, 312 U.S. 45, 51 (1941) ("Upon such a motion [on the pleadings] denials and allegations of the answer which are well pleaded must be taken as true."); *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (movant under Rule 12(c) must demonstrate that "no material fact is in dispute and that it is entitled to judgment as a matter of law." (internal quotation marks omitted) (quoting *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988)); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("[T]he allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false.").

A plaintiff thus "shoulders a heavy burden of justification" to demonstrate entitlement to a favorable judgment on the pleadings by showing no disputed material facts necessary to establish the claim on which judgment is sought, even when the defendant's denials of the plaintiff's allegations are taken as true. *Dist. No. 1*, 933 F.3d at 760. Given this "heavy burden," one leading treatise has opined that "[t]he motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of

law remain to be decided by the district court." 5C Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, Civil, § 1367 (3d ed. 2004).

### B. Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint (or counterclaim) "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" although the allegations need not be "detailed." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The alleged facts must not be "'merely consistent with' a defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (alterations in original) (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)).

In assessing the sufficiency of a complaint under Rule 12(b)(6), a court's consideration is limited "to materials properly before it," including, in this Circuit, "'the facts alleged in the complaint, [and] documents attached thereto or incorporated therein.'" *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (alterations in original) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). All factual allegations in the complaint must be accepted as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## III.    DISCUSSION

The merits of CLASP's two motions are discussed *seriatim*, following consideration of the parties' dispute over the evidence permissibly reviewed to resolve plaintiff's pre-discovery motions.[7]

### A.    CLASP's Forensic Report

As noted, *supra* n.4, CLASP submitted with its Motion for Partial Judgment on the Pleadings a lengthy 349-page Forensic Report that CLASP's counsel describes as "listing the files Defendant Asif Hassan downloaded from CLASP's Box.com cloud storage site and transferred to an external hard drive."  Brenner Decl. ¶ 2.[8]  Hassan argues that the Forensic Report constitutes "factual material outside the complaint" and therefore cannot be considered without converting CLASP's Motion for Partial Judgment on the Pleadings into one for summary judgment.  Def.'s Part. J. Opp'n at 8 (quoting *Kitt v. Pathmakers, Inc.*, 672 A.2d 76, 79 (D.C. 1996)).

---

[7]    Supplemental subject matter jurisdiction may be exercised over CLASP's breach of contract claim and Hassan's employment discrimination claim, both of which are based in D.C. municipal law.  The breach of contract claim shares a common nucleus of operative fact with CLASP's federal trade secrets claim by virtue of Hassan's alleged transfer of files from CLASP's online storage system, as required for the exercise of jurisdiction under 28 U.S.C. § 1367(a), and Hassan's DCHRA claim is against a diverse party, under 28 U.S.C. § 1332, since Hassan is a citizen of Maryland, Compl. ¶ 18; Answer ¶ 18, and CLASP is incorporated and has its principal place of business in the District of Columbia, Compl. ¶ 17; Answer ¶ 17, and Hassan alleges $5,000,000 in damages, well exceeding the amount-in-controversy threshold for diversity jurisdiction, Am. Countercl. at 16.

[8]    The Forensic Report consists of a spreadsheet listing filenames, with some associated information, divided into two sections: the first section, labeled "Box Download Activity," has filenames numbered 1 through 26,142; and the second section, labeled "CLASP CS Export," has filenames numbered 1 through 1339.  *See* Forensic Report.  The associated information next to each filename includes a time and date stamp, the username "Asif Hassan," folder structure/location, and, in the first section, the email address "ahassan@clasp.ngo."  *Id.*  Ironically, given CLASP's claimed concerns about the confidentiality of the data allegedly downloaded by Hassan, the Forensic Report, which CLASP filed unsealed on the public docket in this case, reveals not only CLASP's internal organization for storage and retrieval of electronic files, but also names of CLASP's contracting parties, travel timing and locations, and other details about CLASP's operations.  *See, e.g.*, Forensic Report at 32 ("Prokaushali Sangsad Ltd-PSL_RFP1-18_Technical Proposal" and "Prokaushali Sangsad Ltd-PSL_RFP1-18_Financial Proposal"); *id.* at 39 ("Trip Report – Sam Grant to Dar (June 2017)"); *id.* at 40 ("CONFIDENTIAL – Global LEAP Off-Grid Fan Test Results (16 June 2017)"); *id.* at 204 ("v8 – GIZ EnDev Proposal-Clean"); *id.* at 211-12 ("2018-09-27-Contract for Signature-. . .-Guillaume Monceuax").

Indeed, the complaint does not actually refer to a formal Forensic Report, but only more generally to "Dataprise's forensic analysis," or the results of this analysis, in 13 of the 120 paragraphs of the Complaint. *See* Compl. ¶¶ 5, 6, 11, 53, 54, 57-65, 67, 68, 119. Hassan's response to each of these specific allegations is that he "lacks sufficient information at this time to admit or deny the allegations as set forth in" each of those paragraphs "and therefore denies." Answer ¶¶ 5, 6, 11, 53, 54, 57-65, 67, 68; *see* FED. R. CIV. P. 8(b)(5). He further explicitly denies a number of allegations that seemingly rest on the Forensic Report, including denying: (a) that "he deleted the folder on Box.com that contained the files he downloaded," Answer ¶ 58; (b) "that he downloaded CLASP's proprietary information, data, analytical approaches, as well as business development stratagem and approaches," *id.* ¶ 59; (c) and that "[a]s a result of Defendant's breach of the Confidentiality Agreement, CLASP has incurred costs, including, but not limited to, related to its forensic analysis and efforts to determine the scope and consequences of Defendant's breach," Compl. ¶ 119; Answer ¶ 119 ("Defendant denies allegations in paragraphs 114-120."). Each of these denials must be taken as true, and the associated allegations in the Complaint assumed to be false.

Notwithstanding Hassan's clear denials of all key allegations derived from the Forensic Report set out in the Complaint, CLASP provides only a brief response in a footnote to Hassan's substantive objection to any reliance on the Forensic Report in resolving the motion for partial judgment on the pleadings. CLASP contends that use of the Forensic Report is appropriate at this stage because the report "is 'referred to in the complaint and integral to the plaintiff's claim,'" Pl.'s Part. J. Reply at 5 n.6 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015)), and "the reliability of the document is not challenged, as is evident from Defendant devoting over 7 pages of his 20-page brief to analyzing the forensic analysis in an unavailing effort

16

to defend his actions," *id*.  CLASP's response urging reliance on the Forensic Report misses the mark with both of those proffered reasons by ignoring the import of Hassan's denials.

To be sure, in resolving motions brought pursuant to both Rules 12(b)(6) and 12(c), the general rule is that "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice" may be considered.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Reliance on this general rule becomes more circumscribed, however, when, as here, the plaintiff, as opposed to a defendant, is the moving party seeking a judgment on the pleadings, and is then subject to the Rule 12(c) standard that the allegations of "the complaint are taken as true only where and to the extent that they do not conflict with those of the answer."  *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (quoting *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949)).  Consequently, in this precise context, documentary evidence attached to or referenced in the complaint may not be relied upon when that evidence is disputed or "expressly denied" by the non-moving defendant.  *See, e.g.*, *Hal Roach Studios*, 896 F.2d at 1550 (reversing grant of plaintiff's motion for judgment on the pleadings when "[t]he district court relied on [documents attached to the complaint] to establish . . . [a] factual allegation" "expressly denied" by the non-moving defendant); *Dist. No. 1*, 933 F.3d at 762 (declining to credit a contract attached to the complaint for plaintiff's motion for judgment on the pleadings when defendant disputed whether the contract represented the parties' full agreement); *Stekly v. I.Q. Data Int'l, Inc.*, No. 25-cv-216 (ECF), 2025 WL 2374081, *4 (D. Minn. Aug. 15, 2025) (denials in defendant's answer "must be accepted as true" in the context of plaintiff's Rule 12(c) motion, even if plaintiff's evidence "casts doubt on the truth of" defendant's denials).  The federal procedural rules deem fair that a plaintiff facing a *defendant*'s 12(b)(6) or 12(c) motion may rely on, or must defend against, evidence referenced or attached to the plaintiff's

own complaint but, conversely, that a defendant who has responded with a denial to the accuracy, reliability or inferences to be drawn from allegations promoted solely by the plaintiff in a complaint is spared, pre-discovery, from having to defend against such evidence.

Here, even assuming that CLASP properly incorporated the Forensic Report by reference into its complaint, Hassan denies each of the allegations in CLASP's complaint that pertain to the results of the forensic analysis.  Answer ¶¶ 5, 6, 11, 53, 54, 57-65, 67, 68, 119; *see* 61A Am. Jur. 2d Pleading § 497 (requiring that a plaintiff's motion for judgment on the pleadings to be based only on the "petition, stripped of those allegations which are denied by the defendant's answer"). "Accepting [defendant]'s allegations as true and making all reasonable inferences in [defendant]'s favor, as the Rule 12(c) standards require," means that the Forensic Report cannot support CLASP's motion.  *Dist. No. 1*, 933 F.3d at 763.  This makes sense, given that Hassan has had no opportunity to conduct discovery regarding the Forensic Report, including about the processes employed to conduct the analysis, the qualifications, certifications or expertise of the forensic examiners, and the steps taken to compile and verify the results, nor has Hassan had the opportunity yet to hire his own expert to contest any parts of or conclusions reached in the report or conduct his own analysis of CLASP's server in connection with the allegation that downloaded files were deleted.

Although, as CLASP notes, Pl.'s Part. J. Reply at 5 n.6, Hassan addresses in his Opposition certain substantive parts of the Forensic Report, *see* Def.'s Part. J. Opp'n at 11-17, that does not alter the standard applicable to Rule 12(c) motions, namely, that the non-movant's *pleading* is the focus for discerning disputes, or lack thereof, of material facts necessary for the plaintiff to succeed in a judgment on the pleadings.  In any event, Hassan's discussion of the Forensic Report starts off with his explicit objection to the Forensic Report being considered at this juncture, *id.* at 8, and he

only proceeds to a further discussion of this document by hedging his bets and making arguments in the alternative. To the extent Hassan admits facts in his Answer that are consistent with the Forensic Report, such admissions will be considered; the Forensic Report itself will not.

## B. Breach of Contract

Under District of Columbia law, a party alleging breach of contract must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). CLASP has failed to show, at a minimum, that "no material fact is in dispute" or "entitle[ment] to judgment as a matter of law" as to the damages element of its breach of contract claim. *Peters*, 966 F.2d at 1485 (internal quotation marks and citation omitted). CLASP's motion for judgment on the pleadings as to its breach of contract claim is therefore denied.

Stripped of allegations denied by Hassan, the complaint falls short of showing that CLASP suffered any damages whatsoever from Hassan's alleged actions. Even assuming that "CLASP property" includes everything described in the remarkably broad Confidentiality Agreement—*see, e.g.*, "ideas, products, services, processes, and designs you have or will develop or contribute to and that relate to CLASP's work" and "all copies" thereof—CLASP has not shown how many documents allegedly downloaded on Hassan's hard drive constituted CLASP property or that even one document contained Confidential Information, given that Hassan denies CLASP's allegations as to the number and character of documents taken. Answer ¶¶ 5, 6, 11, 53, 54, 57-65, 67, 68; *id.* ¶ 59 ("Defendant denies that he downloaded CLASP's proprietary information, data, analytical approaches, as well as business development stratagem and approaches."). "[M]aterial issues of fact" abound, and that is "enough to defeat" CLASP's motion. *See Dist. No. 1*, 933 F.3d at 762.

19

CLASP argues that "under District of Columbia law, a plaintiff does not need to prove monetary damages to prevail on a breach of contract claim."  Pl.'s Part. J. Mem. at 9 (citing *Williams v. Cap. One Bank, N.A.*, No. 24-cv-2032 (RC), 2025 WL 843285, at *3 (D.D.C. Mar. 18, 2025); *Wright v. Howard Univ.*, 60 A.D.3d 749, 753 (D.C. 2013)).  The flexibility of the damage element does not allow CLASP to write that element out of the cause of action altogether or to obtain judgment on the pleadings when disputes of fact remain as to that element.  CLASP must at least show "the fact of damage" to prevail on its breach of contract claim.  *See Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C. 1984); *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 10 (D.D.C. 2019) ("The mere danger of future harm, unaccompanied by present injury, will not support a breach of contract claim.").  The plain terms of CLASP's Confidentiality Agreement could allow CLASP to sue a former employee for retaining a single publicly available CLASP report.  The damage element required for a breach of contract claim prevents such harmless violations from becoming causes of action.  Subject to the parameters under Rule 12(c) that the pleadings are considered stripped of those allegations denied by Hassan, CLASP's breach of contract claim in this federal case rests on actions by a terminated employee taking with him his personal documents and photographs and some publicly available employer materials.

Perhaps recognizing the significant outstanding factual disputes, CLASP asks for no damages and instead "reserves the right to seek additional penalties and damages associated with Defendant's breach."  Pl.'s Part. J. Mem. at 12 n.6.  In other words, CLASP seeks judgment on just three of the four elements underlying its breach of contract claim and purports to reserve until another day—after CLASP has the benefit of one-sided discovery in the form of the requested injunction compelling Hassan to turn over literally all of his electronic data and online accounts— essential questions about the scope of Hassan's breach and the resulting damages.  Since material

factual disputes remain, at a minimum, as to damages, CLASP's Motion for Judgment on the Pleadings as to its breach of contract claim is denied.

### C. Employment Discrimination

In a single count, Hassan alleges discrimination based on "race and religion" under the DCHRA.  *See* Am. Countercl. at 13 (Count I) (capitalization altered).  His allegations of disparate treatment are discussed first, followed by a discussion of his allegations that "closely approximate[]" claims that CLASP failed to accommodate his religious practices.  *See Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 96-97 (D.D.C. 2006) (quoting *Klein v. Derwinski*, 869 F. Supp. 4, 8 (D.D.C. 1994)).

#### 1. Disparate Treatment

An employee may prevail on a disparate treatment claim under the DCHRA if they show that their employer "fail[ed] or refuse[d] to hire, . . . discharge[d]," or "otherwise . . . discriminate[d] against [the employee], with respect to his or her compensation, terms, conditions, or privileges of employment, including promotion," "based upon" his "race, color, religion, national origin, sex, age," or several other protected characteristics.  D.C. Code § 2-1402.11(a)(1)(A).  Discrimination claims under the DCHRA are analyzed using the same legal standards as claims under Title VII.  *Guajacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (assessing Title VII and DCHRA discrimination claims under the same framework); *Doe 1 v. George Wash. Univ.*, 369 F. Supp. 3d 49, 69 n.11 (D.D.C. 2019).  Thus, Hassan must plead "two essential elements" for his discrimination claim: "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Hassan has successfully alleged two adverse employment actions—his termination and the reduced amount of severance he received and has pled facts that would "allow[] the court to draw the reasonable inference" that CLASP terminated him and offered a lesser severance based upon his race and his religion. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). His disparate treatment claim thus survives CLASP's dismissal motion.

### a. Adverse Employment Action

"An adverse employment action sufficient to sustain a . . . discrimination claim must amount to a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Gomez v. McDonough*, No. 21-cv-1685 (BAH), 2022 WL 1471375, at *7 (D.D.C. May 10, 2022) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Douglas*, 559 F.3d at 552 (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)); *see also Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that Tile VII "does not set forth 'a general civility code for the American workplace'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))). Although a plaintiff need not show "objectively tangible harm" from an act for the act to constitute an actionable adverse employment action, the plaintiff must still demonstrate an effect on his "terms, conditions, or privileges of employment." *Chambers v. District of Columbia*, 35 F.4th 870, 874-75 (D.C. Cir. 2022). Just because an employee may not like something that happens at a workplace is not enough to meet that standard. "For example, 'changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.'" *Jones v. District of*

*Columbia*, No. 23-cv-1488 (BAH), 2024 WL 1213326, at *7 (D.D.C. Mar. 21, 2024) (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)).

Although Hassan's Amended Counterclaim is not precise in identifying which events constitute adverse employment actions, his opposition briefing provides clarification on this issue, identifying his termination, his low severance offer, "exclusion from events, . . . and his placement on a performance improvement plan" as potential adverse employment actions. Def.'s MTD Opp'n at 13.[9] Each identified adverse employment action is addressed in turn.

Hassan's termination was an adverse employment action, *see* D.C. Code § 2-1402.11 (listing "discharge" as an action that may not be taken based on a protected characteristic), as was his allegedly lower-than-standard severance, *see* Am. Countercl. ¶ 54. Severance constitutes a

---

[9]    Hassan also points, albeit briefly, to CLASP's "inconsistent enforcement of data return policies" as a discriminatory act, though this enforcement occurred after Hassan had been terminated. Def.'s MTD Opp'n at 34; Compl. ¶ 59. The DCHRA prohibits employers from "discriminat[ing] against any individual, with respect to his or hers . . . terms, conditions, or privileges of employment" based on a protected characteristic. D.C. Code § 2-1402.11(a)(1)(A). Like Title VII, which contains identical language, *see Guajacq*, 601 F.3d at 576, the DCHRA does not define "individual." *See id.* § 2-1401.02; 42 U.S.C. § 2000e. As the Supreme Court has repeatedly noted, words such as "individual" or "employee" may or may not encompass former employees depending on the "context" in which they are used—even within a single antidiscrimination statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 346 (1997); *see Stanley v. City of Sanford*, 145 S. Ct. 2058, 2064-65 (2025) ("Title VII sometimes bars discrimination against former employees as well as current ones. . . . But elsewhere in Title VII, context clarifies that the term 'employee' refers unambiguously to a current employee." (internal quotation marks omitted) (quoting *Robinson*, 519 U.S. at 343)). For instance, Title VII's retaliation provision textually protects only "employees [and] applicants for employment" but has nonetheless been interpreted to prohibit retaliatory acts taken after the end of employment, based on the "context" in which the word "employee" is used and the "purpose" of Title VII's retaliation provision. *See Robinson*, 519 U.S. at 339, 346 (1997).

The DCHRA's antidiscrimination provision uses the broad term "individual" and includes the limitation that a discriminatory act must affect the "terms, conditions, or privileges of employment." *See* D.C. Code § 2-1401.02. While no "temporal qualifier" limits "individual" to cover only current employees, *see Robinson*, 519 U.S. at 342, an adverse action taken after employment must nonetheless be sufficiently attached to the employment relationship to affect the "terms" or "conditions" of that employment. *See Hishon v. King & Spalding*, 467 U.S. 69, 75, 77 (1984) (holding that "a benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory manner" even if the benefit does "not accrue before a person's employment is completed"); *Carney v. Am. Univ.*, No. 95-cv-1054 (JHG), 1995 WL 929001, *5 (D.D.C. Nov. 22, 1995) (denying motion to dismiss DCHRA claim based on severance denial after termination). Here, Hassan has not alleged factual support for the claim that CLASP's enforcement of the Confidentiality Agreement was based on his race or religion, *see* Compl. ¶ 59; Def.'s MTD Opp'n at 13 (mentioning enforcement of the Confidentiality Agreement only passingly), and, consequently, the question whether the enforcement was sufficiently connected to his employment relationship to constitute an adverse employment action affecting the terms and conditions of employment is not reached. Moreover, while intentional infliction of emotional distress (IIED) claims may be sustained against former employers for actions taken against former employees after the end of the employment relationship, s*ee Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008), Hassan does not assert that cause of action here.

term of employment, and discriminatory distribution of severance payments can give rise to a disparate treatment claim. *See Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 268-69 (4th Cir. 2012); *see also Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all."); *id.* at 77 ("A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship. Pension benefits, for example, qualify as terms, conditions, or privileges of employment . . . ."). Hassan points to a "standard 4+ months [of severance]" for which he was "eligible," and alleges that CLASP instead offered him two-and-a-half months of severance. Am. Countercl. ¶ 54. This reduced severance thus constitutes an adverse employment action.

Hassan further identifies his exclusion from an October 2024 conference, the Global Off-Grid Solar Forum, as an adverse employment action. *See* Def.'s MTD Opp'n at 15. Hassan "secured pre-approval from CLASP-Nairobi office Senior Director" to attend the Forum in Nairobi. Am. Countercl. ¶ 18. Later, however, Hassan was "the only individual excluded/removed from the original pre-approved list" and was not permitted to attend the Forum, unlike some of his "White, American born, . . . non-Muslim" colleagues. *Id.* CLASP told Hassan that he would not be able to attend due to "funding constraints." *Id.* ¶ 19. This exclusion, while plainly disappointing for Hassan, does not constitute an adverse employment action. Hassan "merely alleges that the denial of travel *could* affect . . . [his] professional development" or exposure to other professionals in his field, which are too speculative of effects to constitute a change to the terms and conditions of employment. *See Doe v. Gates*, 828 F. Supp. 2d 266, 270 (D.D.C. 2011) (emphasis in original); Am. Countercl. ¶ 18. The decision about who ought to attend an overseas conference on CLASP's behalf is an "ordinary workplace exercise of authority that did not adversely affect the conditions

of plaintiff's employment, though [the decision] undoubtedly caused tribulations[] [and] eroded plaintiff's morale." *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022); *see* Am. Countercl. ¶ 19 (exclusion from conference "impacted Mr. Hassan's self-esteem and felt demoralizing").

Hassan also points to his placement on a PIP as an adverse employment action.  Def.'s MTD Opp'n at 16.  Hassan's placement on the PIP does not qualify as an adverse employment action, although the PIP provides context for the events leading to his March 2025 dismissal. "[N]egative annual performance appraisals and improvement plans do not constitute adverse actions absent evidence of a change in the employee's benefits, responsibilities, or job titles." *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 81-82 (D.D.C. 2020).[10]  A PIP has been considered an adverse employment action when "accompanied by a bonus differential," for example, *Russell*, 257 F.3d at 819, but Hassan does not allege that placement on the PIP itself automatically caused him to lose pay, be moved to a different job, or otherwise suffer a material harm, *see* Am. Countercl. ¶¶ 37-39, 44, other than his ultimate termination, which is a separate adverse employment action.  While the placement on a PIP was "stressful" and made Hassan feel that he "could not say 'No'" to requests from his supervisors, *id.* ¶¶ 36, 38, 44, that is presumably true of every PIP, and without more does not make the PIP an adverse employment action.

The Amended Counterclaim thus alleges two events constituting adverse employment actions: Hassan's termination and the amount of severance he received.[11]

---

[10]    For the proposition that a PIP can constitute an adverse employment action, Hassan cites *Nguyen v. Mabus*, which does not mention performance improvement plans or employee disciplinary actions at all.  895 F. Supp. 2d 158 (D.D.C. 2012).

[11]    In his opposition to CLASP's Motion to Dismiss, Hassan alleges that "[d]uring the two quarterly performance reviews in 2023, Mr. Taylor verbally communicated to Mr. Hassan that he [was] very likely to get promoted to the position of Manager, Climate team which never happened."  Def.'s MTD Opp'n at 14 n.2.  Even if Hassan had properly pled these factual allegations in his Amended Counterclaim, which he did not, *see generally* Am. Countercl., he does not point to any evidence in any of his filings connecting the failure to promote him to a discriminatory motive, *see* Def.'s MTD Opp'n at 14 n.2.

        *b.  Causation*

    Having established that Hassan sufficiently alleged adverse employment actions, Hassan must also adequately allege a causal connection between those adverse actions and his race or religion.  *See Heavans*, 648 F. Supp. 3d at 14.  Hassan first points to CLASP's given reasons for his termination.  Reading between the lines of Hassan's Amended Counterclaim, he alleges that when CLASP decided to end support for programming in Bangladesh, it terminated him because he was Bangladeshi and CLASP assumed he could therefore only work on Bangladesh-related projects.  *See* Am. Countercl. ¶ 52 ("[T]erminating him based on the reason that CLASP wanted to discontinue working in Bangladesh [was] unjustified and discriminatory . . . [because] Hassan's work agreement with CLASP never termed him as a Bangladesh focused employee.").  According to Hassan, he also "supported projects in Indonesia, India, Kenya, Uganda, [the] USA, and several other African countries."  *Id.* ¶ 9.  At this early stage, Hassan's allegations allow a "plausible inference" that Hassan was terminated because of his race or national origin.  To be sure, Hassan concedes that he "le[d] CLASP's program in Bangladesh," *id.* ¶ 9; *see also id.* ¶ 23, and that "for several years, [CLASP] assigned Mr. Hassan to work in the country, conducting programmatic activities for extended periods," *id.* ¶ 42.  Nevertheless, he also alleges that he was "CLASP's in-house electric cooking expert," a non-country-specific program, *id.* ¶ 18, and that he had traveled, in the year preceding his termination, to other countries to support CLASP's work, *id.* ¶ 15 (trip to Uganda in March 2024); *id.* ¶ 16 (trip to Brazil in May 2024).  While CLASP was free to terminate its programs in Bangladesh, CLASP was not free to assume that, because of his South Asian race or Bangladeshi national origin, Hassan could not work on other programs.  CLASP may have other reasons for terminating Hassan, but at this stage Hassan has raised a plausible inference of discriminatory motive that survives CLASP's Motion to Dismiss.

Regarding his low severance offer, Hassan names two comparators who received higher severance than he did. Am. Countercl. ¶ 55. One way a plaintiff can show that an adverse employment action he suffered gives rise to "'an inference of discrimination'" "is by demonstrating that []he was treated differently from similarly situated employees who are not part of the protected class." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)). While "it cannot be enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator," courts have "never required a complaint to include factual allegations showing that the comparator's circumstances are 'nearly identical' to the plaintiff's in 'all relevant respects.'" *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 531 (D.C. Cir. 2025) (quoting *Joyner v. Morrison & Foerster LLP*, No. 20-cv-1440 (TJK), 2023 WL 6313194, *5 (D.D.C. Sept. 27, 2023)). At the motion to dismiss stage, a comparator allegation must simply "contain[] allegations that a comparator was similarly positioned to the plaintiff in at least some relevant respects, and include[] enough detail that [a court] could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Id.*

Hassan's allegations clear this bar. He alleges that employees were eligible for a "standard 4+ months" severance, Am. Countercl. ¶ 54, that two other employees, one of whom had his same job, received that standard package, *id.* ¶¶ 54-55, and that he did not, *id.* ¶ 54. He also identifies the races and religions of his two comparators, neither of whom was South Asian, Bangladeshi, or Muslim. *Id.* ¶ 55. CLASP argues that Hassan "does not allege any facts about the[] [comparators'] qualifications or experience, the nature of their work, their tenure at the company, their supervisor, or the reasons for their termination." Pl.'s MTD Reply at 9. Hassan stated, however, that one comparator, Ana Luisa Sosa, held the same job title as Hassan, had worked at CLASP for "a similar

number of years," and was terminated around the same time, and that she, unlike Hassan, is a "Hispanic, Venezuelan born . . . , [and] non-Muslim." Am. Countercl. ¶ 55; Def.'s MTD Opp'n at 20. While Hassan may need to supply more facts to ultimately prevail on his claim, alleging that CLASP had a standard severance policy that was applied contemporaneously to another individual with the same job and same approximate tenure but different protected characteristics is enough to survive a motion to dismiss.

In sum, Hassan has alleged sufficient factual material to state a claim for disparate treatment at least as to his termination and severance offer, and therefore his claims survive CLASP's Motion to Dismiss.[12]

### 2. *Failure to Make Religious Accommodations*

Although Hassan identifies his claim as "disparate treatment," Am. Countercl. at 13 (capitalization altered), he cites to a section of the D.C. Code encompassing multiple causes of action, and some of his allegations "'more closely approximate[]' one of . . . failure to accommodate" his religious practices, rather than standard disparate treatment. *See Lemmons*, 431 F. Supp. 2d at 96-97 (noting that this distinction can be "made even more difficult by the plaintiff's own failure to clearly and distinctly plead [their] cause of action in this regard"); *see also* Am. Countercl. ¶ 70; *id.* at 13 (specifying that Hassan's claims arise under D.C. Code §§ 2-1401 *et seq.*,

---

[12]     Hassan also alleges that he was treated "less favorably" by "being denied proper vacation time off, being forced to go to the office the same day his wife had a miscarriage[,] attending non-technical training[,] . . . [and] being terminated on the spot without any prior notice" rather than receiving a "proper farewell." Def.'s MTD Opp'n at 14; *see also* Am. Countercl. ¶¶ 21, 44 ("Taylor asked Mr. Hassan to join a meeting while he was on vacation," and Hassan "work[ed] through the Christmas holidays"); *id.* ¶ 38 (attending work after wife's miscarriage); *id.* ¶ 49 ("Hassan was abruptly terminated without any formal notice or explanation."). Although he does not closely tie any of these specific instances to his race or religion, he alleges that CLASP's failures to accommodate his religious practices "reflect[] a broader insensitivity to his Muslim identity and a discriminatory intent." Am. Countercl. ¶ 71. These allegations more closely resemble a hostile work environment claim, which Hassan does not assert and is therefore not considered. Since Hassan's disparate treatment claim survives CLASP's Motion to Dismiss, these facts may provide "background evidence" for Hassan's claims about specific adverse employment actions. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

which includes both disparate treatment and religious accommodation causes of action).  Hassan argues that he "was denied basic religious accommodation including time for prayer, leave for Eid, and halal or religiously compliant food at religious events," and that these denials constituted discrimination based on his religion.  Def.'s MTD Opp'n at 15.  Whether Hassan has stated a claim under the DCHRA's religious accommodation provision is therefore covered next.

Title VII defines "religion," as a listed protected class, to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship."  42 U.S.C. § 2000e(j).  To make a *prima facie* case of failure to accommodate religious practices, plaintiffs must show that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement."  *Lemmons*, 431 F. Supp. 2d at 95 (quoting *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006), and citing cases from other circuits for the same test); *see also Taub v. FDIC*, No. 96-5139, 1997 WL 195521, *1 (D.C. Cir. Mar. 31, 1997) (approving these elements).

The DCHRA, on the other hand, provides no definition of religion, but offers a separate, free-standing provision requiring "[a]ccommodation for religious observance."  D.C. Code § 2-1402.11(c).  That provision makes it unlawful for "an employer to refuse to make a reasonable accommodation for an employee's religious observance by permitting the employee to make up work time lost due to such observance, unless such an accommodation would cause the employer undue hardship."  *Id.* § 2-1402.11(c)(1).  Few published cases have discussed the DCHRA's religious accommodation provision, and none has established a standard under which such claims should be evaluated.  *See Lemmons*, 431 F. Supp. 2d at 97 (remanding DCHRA religious

accommodation claim to D.C. Superior Court as a "novel issue of state law"); *Arencibia v. 2401 Restaurant Corp.*, 699 F. Supp. 2d. 318, 324 (D.D.C. 2010) (allowing claim to survive motion to dismiss when plaintiffs alleged they were terminated for observing religious holidays, without discussing the standard for evaluating such claims).

Although "[t]he burdens of persuasion and production for claims raised under . . . the [DCHRA] are identical to those for claims alleging discriminatory treatment in violation of Title VII," *Mungin*, 116 F.3d at 1553, here, textual differences between the two statutes regarding religious accommodation may be significant. On one hand, the DCHRA's text precludes application of Title VII's broad obligations on employers to accommodate "all aspects of religious observance and practice," *see* 42 U.S.C. § 2000e(j); the DCHRA instead requires only that employers allow their employees to take time off for religious observance and make that time up later, *see* D.C. Code § 2-1402.11(c)(1). On the other hand, while Title VII incorporates religious accommodations into the definition of "religion" and therefore requires employees to show an adverse employment action taken in response to their religious practice in order to sustain a failure to accommodate claim, *see Taub*, 1997 WL 195521, at *1, the DCHRA creates a separate cause of action for failure to accommodate a request for time off for religious observance, *compare* D.C. Code § 2-1402.11(a) (disparate treatment), *with id.* § 2-1402.11(c)(1) (religious accommodation). In this sense, the DCHRA's religious accommodation requirement resembles the Americans with Disabilities Act's (ADA) reasonable accommodations provision, *see* 42 U.S.C. § 12112(b)(5), under which employees must show only that they needed, requested, and were denied a reasonable accommodation, not that that they suffered some additional adverse employment action, *see Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (stating that, to show a failure to accommodate, a plaintiff must demonstrate "that (i) she was disabled within the meaning of the Rehabilitation

Act; (ii) her employer had notice of her disability, . . . (iii) she was able to perform the essential functions of her job with or without reasonable accommodation, . . . and (iv) her employer denied her request for a reasonable accommodation of that disability").

Borrowing from both the Title VII religious accommodation standard and the ADA reasonable accommodation standard, an employee seeking to allege a violation of DCHRA's religious accommodation provision must show that the employee "held a bona fide religious belief" requiring time off for religious observance, *Lemmons*, 431 F. Supp. 2d at 95, that the "employer had notice of" the religious need, *Solomon*, 763 F.3d at 9, and that the employer "denied [the employee's] request" "to make up work time lost due to such observance," *id.*; D.C. Code § 2-1402.11(c)(1).  Set against these elements, Hassan sufficiently alleges a claim of failure to accommodate his religious practices to survive CLASP's dismissal motion.

Hassan points to several instances in which CLASP allegedly failed to accommodate his religious practice, including when CLASP (1) failed to provide halal food at work events, despite his requests, Am. Compl. ¶ 63; (2) terminated his employment during Ramadan on a Friday, causing him "to miss the weekly Friday prayer at the mosque," Am. Countercl. ¶ 48; (3) denied him time off to celebrate the Eid festivals, Am. Countercl. ¶ 65; and (4) told him it "would be good" for him to travel and attend an event in person while he was fasting during Ramadan, Am. Countercl. ¶ 64.

Hassan's claim that CLASP failed to provide halal food does not fall within the DCHRA's religious accommodation requirement.  CLASP could not have accommodated the religious need by "permitting the employee to make up work time lost due to such observance," D.C. Code § 2-1402.11(c), and thus the claim fails to meet the basic requirements of the DCHRA.

Drawing all inferences in Hassan's favor, Hassan states a claim as to CLASP scheduling his termination meeting during Muslim's "weekly prayer" time.  Am. Countercl. ¶ 48.  Although Hassan does not allege that he requested that the meeting be scheduled at a different time and was denied, he states that he attended "weekly Friday prayer at the mosque" and that CLASP's HR Director told him that 2:00 PM on March 14, 2025, was "the only time that would work for her and Ms. Carreno," who also attended the meeting.  *Id.*  If Hassan attended this prayer service weekly, the inference can be drawn that CLASP knew of Hassan's need for time off for religious observance and nonetheless insisted that he attend a meeting at that very time.  At least until that factual dispute is resolved, Hassan has stated a claim that CLASP denied him an accommodation for religious observance as to this meeting.

Hassan also states a claim as to the denial of time off for the Eid festivals, alleging that "he was never provided with any time off to celebrate Eid Ul Fitr and Eid Ul Adha" and "was only able to celebrate those [holidays] if [they] happened on a weekend."  Am. Countercl. ¶¶ 65, 70.  This constitutes a claim that CLASP denied Hassan an accommodation for religious observance.

Finally, Hassan alleges that he "felt pressured by CLASP" to "travel during Ramadan," even though he explained to Amanda Upshaw, CLASP's Chief of Staff, that doing so "would be difficult" because he was fasting.  Am. Countercl. ¶ 64.  Hassan's claim has some shortcomings. He did not request to "make up work time lost due to [religious] observance," but rather to be excused from traveling to an event in person and instead to be permitted to attend online.  *See* D.C. Code § 2-1402.11(c)(1); Am. Countercl. ¶ 64.  Hassan's Amended Counterclaim is also vague as to whether Upshaw discouraged him from attending the event virtually in a manner forceful enough to constitute a denial of his request for accommodation.  Am. Countercl. ¶ 64; *Lemmons*,

431 F. Supp. 2d at 95. Nonetheless, these allegations just clear the bar of plausibility that CLASP's actions may have run afoul of the DCHRA's bar on religious accommodation.

Thus, three of Hassan's claims of failure to accommodate his religious beliefs state a claim under the DCHRA's religious accommodation provision. Those and his other claim regarding halal food may also all be used as evidence as to his disparate treatment claims.

## IV.    CONCLUSION

For the foregoing reasons, CLASP's first Motion to Dismiss, ECF No. 11, addressed to Hassan's original Counterclaim, ECF No. 7 at 10, which has been superseded by an Amended Counterclaim, ECF No. 16, is denied as moot. In addition, CLASP's pending motions for partial judgment on the pleadings on its breach of contract claim and to dismiss Hassan's Amended Counterclaim, ECF Nos. 9 and 18, are denied. An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: November 3, 2025

_____
**BERYL A. HOWELL**
United States District Judge